**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE 1993 EXXON COKER FIRE | § | Master Docket No. 3:93-MD-2-BMGL-SCR |
| | § | |
| | § | **APPLIES TO**: 3:07-CV-348 |
| | § | 3:07-CV-349 |
| | § | 3:07-CV-350 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

On August 2, 1993, a fire occurred at the East Coker Unit of the Exxon Chemical Plant in Baton Rouge, Louisiana. The fire resulted from the failure of a six-inch elbow pipe fitting. Within a couple of hours, the main fire and a smaller residual fire were extinguished. Approximately 5,700 individuals filed suit against ExxonMobil Corporation ("ExxonMobil"), seeking compensatory and punitive damages. None of these Plaintiffs were on ExxonMobil's property at the time of the fire. In its adjudication of Defendant's Motion for Summary Judgment, the Court determined that Plaintiffs did not suffer physical injuries as a result of the fire.

By agreement of the parties, a bench trial was conducted on January 28, 2008, to determine ExxonMobil's liability. The Court hereby enters its Findings of Fact and Conclusions of Law under Fed. R. Civ. P. 52(a).

### FINDINGS OF FACT

1.  ExxonMobil Corporation is a successor in interest to Humble Oil & Refining Company ("Humble Oil").

2. In 1962, Humble Oil entered into a contract with Foster Wheeler Corporation ("Foster") to construct the East Coker Unit of Humble Oil's Baton Rouge refinery. Foster's work was accepted in 1963.

3. From 1962 to 1993, the land upon which the East Coker Unit sits was owned by ExxonMobil or one of its predecessors in interest.

4. ExxonMobil or one of its predecessors in interest possessed, owned, and operated the East Coker Unit from 1963 through 1993.

5. The East Coker Unit was one of three coker units at ExxonMobil's Baton Rouge facility. It was a typical four drum coker unit. A four drum coker unit contains approximately forty-one miles of pipe and tubing, and approximately ten thousand connecting elbows.

6. The East Coker Unit, which converted high-sulfur, crude oil into gasoline, diesel, and jet fuel, produced substantial economic benefits to ExxonMobil, Baton Rouge and its citizens, and the U.S. economy.

7. At approximately 4:00 a.m. on August 2, 1993, a six-inch, forty-five degree carbon steel elbow (the "elbow") in the pipe spool for Pump P-2A/B discharge piping in the East Coker Unit failed and ruptured; a fire resulted from the rupture.

8. Although the design specifications called for the elbow installed by Foster to be manufactured of 5 chromium, ½ moly steel, Foster instead selected and installed a carbon steel elbow.

9. High-temperature sulfur, such as that flowing through the pipes of the East Coker Unit, corrodes carbon steel faster than it would corrode chromium steel. As a result of that corrosion, the walls of the carbon steel elbow thinned over time, and eventually the elbow was unable to withstand normal operating pressure, which caused it to rupture significantly sooner than it would

have had it been constructed of chromium steel.

10. At the time of the elbow's failure, the pipe temperature and pressure at the location of the elbow were within normal operating parameters.

11. Plaintiffs did not prove what the standard industry practice was for monitoring corrosion and thinning in elbow piping carrying products such as those flowing in the East Coker Unit.

12. Plaintiffs did not prove that ExxonMobil's protocol for monitoring pipe corrosion in the East Coker Unit was deficient.

13. It is impossible for an operator of a facility the size of the East Coker Unit to inspect continuously the thickness of every inch of wall of every elbow pipe in a system.

14. Plaintiffs did not prove that ExxonMobil's protocol for monitoring elbow corrosion was inadequate in light of the fluid that passed through the piping, nor did Plaintiffs otherwise prove that a different protocol was more reasonable.

15. Plaintiffs did not prove what the standard industry practice was between 1963 and 1993 for retroactive positive material identification ("PMI")—the process by which an operator verifies that piping is composed of the originally specified material.

16. Plaintiffs did not prove that ExxonMobil's PMI program violated federal requirements or standard industry practice.

17. In 1993, PMI testing on an operating system was not feasible. To conduct PMI testing on a piping system, the system would first have to be shut down to enable the pipes to cool. ExxonMobil thus conducted PMI testing in the East Coker Unit during scheduled shutdowns, or "turnarounds," which occurred approximately every eighteen months.

18. It would take ExxonMobil approximately ten turnarounds, or fifteen years, to test

each individual elbow in the East Coker Unit, assuming Defendant restricted PMI testing to scheduled turnarounds.

19. The asbestos casing around many elbows in the East Coker Unit piping precluded PMI testing of every elbow. Removal of such insulation would be extremely costly and fraught with health risks, exposing ExxonMobil workers to asbestos.

20. Plaintiffs are community residents within a ten-mile radius of the East Coker Unit who were not at the East Coker Unit or otherwise on ExxonMobil property on August 2, 1993.

21. An elbow failure in a coker unit typically results in a small, containable leak.

22. Plaintiffs did not prove how many elbow pipes in the East Coker Unit conveyed flammable materials.

23. Plaintiffs did not prove that a carbon steel elbow in the East Coker Unit posed a reasonably foreseeable threat of a large fire, nor that such a fire would pose a risk of injury or property damage to residents of the surrounding community.

24. Plaintiffs did not prove a substantial likelihood that a carbon steel elbow in the East Coker Unit would result in a large fire, nor that such a fire would pose a risk of injury or property damage to residents of the surrounding community.

25. Plaintiffs did not prove a reasonably foreseeable risk that a ruptured elbow in the East Coker Unit would result in a large fire, nor that such a fire would impact residents of the surrounding community.

26. Plaintiffs did not prove a substantial likelihood that a ruptured elbow in the East Coker Unit would result in a large fire, nor that such a fire would impact residents of the surrounding community.

27. Plaintiffs did not prove a reasonably foreseeable risk that residents of the surrounding

community would be exposed to dangerous chemicals from a fire resulting from a ruptured elbow in the East Coker Unit.

28.     Plaintiffs did not prove a substantial likelihood that residents of the surrounding community would be exposed to dangerous chemicals from a fire resulting from a ruptured elbow in the East Coker Unit.

29.     Plaintiffs did not sustain any physical injuries as a result of the fire of August 2, 1993.

30.     Plaintiffs did not prove that Defendant was negligent with respect to the events of August 2, 1993.

31.     Plaintiffs did not prove the elements of strict liability with respect to the events of August 2, 1993.

32.     Any Finding of Fact that is more properly a Conclusion of Law should be so construed.

## CONCLUSIONS OF LAW

1.     To recover for strict liability under article 2317 of the Louisiana Civil Code for events in 1993, a plaintiff must prove "that he was injured by a defective thing which was in the care or custody of the defendant." *See* La. Civ. Code Ann. art. 2317 (West's La. Stat. Ann. 1993); *Fonseca v. Marlin Marine Corp.,* 410 So.2d 674, 679 (La. 1981). ExxonMobil had custody over the East Coker Unit, which was a "thing" under article 2317. *See Olsen v. Shell Oil Company*, 365 So.2d 1285, 1290 n.8 (La. 1979).

2.     To recover for strict liability under article 2322 of the Louisiana Civil Code for events in 1993, a plaintiff must prove "that his injury was caused by the ruin of a building owned by the defendant, and that the ruin was attributable to a vice in the building's original construction or to

a failure to repair it." La. Civ. Code Ann. art. 2322 (West's La. Stat. Ann. 1993). Under article 2322, a "building" includes its component parts. The East Coker Unit, including component pipes and elbows, was a "building" under article 2322. *See Olsen*, 365 So.2d at 1289 (broadly defining "building" as any permanent structure, whether or not intended for habitation).

      3.      A structure is "defective" under 2317, or contains a "vice" under 2322, when it poses an unreasonable risk of injury to others. *Ladue v. Chevron, U.S.A., Inc.*, 920 F.2d 272, 274 (5th Cir. 1991). However, proof that a condition is hazardous is not conclusive of the issue of whether it is *unreasonably* dangerous. *Matt v. Cox*, 478 So.2d 918, 921 (La. App. 1st Cir. 1985), *writ denied*, 479 So.2d 913 (La. 1985) ("The fact that a thing creates a hazard does not necessarily mean it is defective within the meaning of strict liability."). A finding of strict liability under Louisiana law, for events that occurred in 1993, requires proof of an unreasonable danger.

      4.      A cost-benefit approach must be applied to determine whether a particular condition poses an unreasonable risk of injury. *Celestine v. Union Oil Company of California*, 652 So.2d 1299, 1304 (La. 1995).

      5.      To conduct a valid cost-benefit analysis, a court must assess the utility of the overall structure, not merely that of the defective component, and weigh it against the risks created by the alleged defect. *See Cox*, 478 So.2d at 921; *Hunt v. City Stores, Inc.*, 387 So.2d 585, 588 (La. 1980). For example, in *Matt v. Cox*, the court considered whether an open water meter box in plaintiff's yard was unreasonably dangerous. 478 So.2d at 921. Rather than focusing on the allegedly defective box, the Court analyzed the entire "water system of Terrebonne Parish, including the water meter boxes, [which are] a necessity. The waterworks offers a service to the residents . . . ." *Id.*

      6.      The *Cox* approach, which considers the utility of the larger system in which the allegedly defective component operates, is consistent with the Louisiana Supreme Court's decision

in *Celestine*, 652 So.2d at 1305. There, the court considered whether a faulty handrail on an offshore oil and gas platform constituted a vice or defect under articles 2317 and 2322. Rather than narrowly focusing on the handrail, the Louisiana Supreme Court analyzed the entire platform, noting that "the offshore platform was a structure with obvious social and economic utility and corresponding benefits." *Id.* In reaching this conclusion, the *Celestine* court approvingly cited *Ladue*, where the Fifth Circuit considered whether a decayed deck grating on an offshore mineral-production platform constituted a defect. 920 F.2d at 277. In *Ladue*, the Fifth Circuit broadly analyzed utility, emphasizing the "social and economic benefits" of the entire mineral-production platform. *Id.* Thus, the Court assesses the utility of the entire East Coker Unit, rather than the failed elbow.

      7.      The East Coker Unit has substantial economic value. By converting crude oil into gasoline, diesel, and jet fuel, the East Coker Unit helped satisfy the national demand for motor fuel.

      8.      In conducting the necessary cost-benefit analysis, a court must address the risks posed by the alleged vice or defect. In measuring risk, Louisiana law departs from traditional tort principles. Under articles 2317 and 2322, risk is defined vis-à-vis the claimants and others situated similarly to them:

> Unlike the regime of strict products liability, which uses the "ordinary consumer" as its benchmark, Louisiana's scheme of strict liability under articles 2317 and 2322 posits no constant person or persons, mythical or real, with respect to whom the reasonableness of a given risk is to be measured. For that reason, the Louisiana courts have found themselves - under the rubric of assessing a risk "under all of the circumstances of a particular case" - determining the reasonableness of a given risk "vis-à-vis the plaintiff," or more accurately, vis-à-vis the plaintiff and those similarly situated. Therefore, we need not determine whether the grating on Chevron's platform was unreasonably dangerous with respect to the world at large, or even with respect to the Chevron employees who performed their daily work on the platform. We need only determine whether the grating was unreasonably dangerous with respect to Ladue and those similarly situated.

*Ladue*, 920 F.2d at 277 (internal citations omitted). *Oster v. Department of Transportation and*

*Development* further illustrates the necessary risk analysis under Louisiana strict liability law. 582 So.2d 1285, 1291 (La. 1991). There, the plaintiff crashed into a drainage ditch, concealed by overgrown grass, while illegally driving his dirt bike on the side of the highway. The court determined that the drainage ditch posed an unreasonable risk of injury to off-road motorcyclists, pedestrians, joggers, and cyclists who regularly used that strip of land. Reversing, the Supreme Court defined risk vis-à-vis Plaintiffs and others similarly situated: "Whether the area in question is frequented by pedestrians, joggers, or bicycle riders is of little relevance; this case does not involve a pedestrian, a jogger, or a bicycle rider. We are here concerned with a dirt bike rider operating his vehicle some seven to ten feet off the shoulder of the highway, over unknown terrain, through high grass, at a high rate of speed . . . ." *Id.* The relevant issue here is whether the presence of a carbon steel elbow posed an unreasonable risk of harm not to workers at the East Coker Unit at the time of the fire, but rather to residents of the surrounding community like Plaintiffs.

9. Risk has three components: magnitude, probability, and the cost to mitigate or remove the risk.

10. Here, the first prong of the risk analysis—the magnitude of the risk to the community—does not support liability under articles 2317 and 2322. Plaintiffs did not prove what they argued—that a ruptured elbow would release "millions and millions and millions of gallons of volatile chemicals," with the "potential of blowing up the entire city." (Trial Tr. 155, Jan. 28, 2008) Plaintiffs' experts addressed only the danger from a ruptured elbow to workers inside the East Coker Unit. There was no evidence regarding: (1) whether a fire from a ruptured elbow would likely spread to the surrounding community; (2) what the impact of a fire would be on persons and property outside the East Coker Unit; (3) whether a fire resulting from a ruptured elbow could likely be contained in the East Coker Unit; and (4) what the likelihood of chemical exposure would be to

residents of the surrounding community as result of a fire due to a ruptured elbow; thus, Plaintiffs did not prove that a ruptured elbow posed an unreasonable and serious risk to the surrounding community.

11. Analysis of the second prong of the risk assessment—the probability of physical injury or property damage from a ruptured elbow—also does not support liability under articles 2317 or 2322. Plaintiffs did not demonstrate a substantial likelihood that a ruptured elbow would result in a large fire. There was no evidence regarding the percentage of elbows in the East Coker Unit conveying flammable materials and, in fact, Plaintiffs' expert, Dr. Busch, acknowledged that many elbows carried nonflammable substances. Dr. Busch also testified that burst pipes rarely explode, and that most elbow failures result in small, containable leaks, which do not pose a risk to individuals outside of the facility.

12. The third prong of the risk analysis—the cost to remove the alleged defect—also militates against a finding of strict liability. *Oster*, 582 So.2d at 1289. Asbestos insulation, which surrounds many elbows in the East Coker Unit, would have to be removed prior to repair—a costly process with significant health consequences for ExxonMobil employees.

13. The Court concludes that the utility of the East Coker Unit in 1993 outweighed the risk to the community from the presence of a carbon steel elbow.

14. The risk-utility analysis conducted above is relevant to, but not determinative of, the issue of whether strict liability should be imposed under articles 2317 and 2322. *See Celestine*, 652 So.2d at 1304. "Justice and social utility must serve as guideposts and moral, social and economic values must be considered in a determination of whether the risk is unreasonable." *Id.* Whether a danger is evident to a potential victim is a relevant moral consideration. *See Oster*, 582 So.2d at 1291. Although the corroded steel elbow here was not evident to Plaintiffs, the Court in

consideration of all of the applicable concerns, including the moral, social, and economic values present here, concludes that strict liability under articles 2317 and 2322 should not be imposed here.

15. Plaintiffs also contend that ExxonMobil was negligent for failing to discover the corroded carbon steel elbow prior to its rupturing. Plaintiffs contend that a prudent operator would have individually inspected the ten thousand elbows in the East Coker Unit to confirm that they were composed of chromium steel. Plaintiffs did not prove that a one hundred percent retroactive inspection represented the standard of care for such a facility. First, Plaintiffs' proposed PMI program omits an essential detail—the timeframe for completing retroactive verification. Plaintiffs' expert, Dr. Busch, merely testified that ExxonMobil should "eventually" inspect all of the elbows. (Trial Tr. 75, 94) The appropriate inspection timeframe influences the cost, feasibility, and probability of timely discovering improper elbows. For example, restricting PMI testing to scheduled turnaround periods when the East Coker Unit was shut down, occurring every eighteen months, prolonged the inspection process, but also required fewer shutdowns, avoiding productivity losses. Plaintiffs' evidence did not evaluate these considerations, except to calculate that it would take ExxonMobil approximately ten turnarounds, or fifteen years, to test each individual elbow in the East Coker Unit, assuming Defendant restricted PMI testing to scheduled turnarounds. That analysis was insufficient to prove that ExxonMobil's testing methodology was not reasonable.

16. Second, the cost of one hundred percent retroactive verification outweighs the risk of a ruptured elbow to the residents of the surrounding community. Dr. Busch acknowledged that inspecting ten thousand elbows would impose substantial costs on Defendant, including health risks to ExxonMobil employees from removal of asbestos. The unquantified risk to residents of the surrounding community resulting from a ruptured elbow does not justify these costs.

17. Third, Occupational Safety and Health Administration regulations and American

National Standards Institute standards do not require retroactive PMI testing of every elbow in a coker unit, and such a program has not been adopted by any coker unit in the United States.

18.     Plaintiffs did not prove that one hundred percent retroactive PMI testing was a reasonable requirement, and the Court thus rejects Plaintiffs' first theory of negligence.

19.     Alternatively, Plaintiffs argue that ExxonMobil did not maintain an adequate program to monitor elbow corrosion. Plaintiffs argue that ExxonMobil should have regularly measured the wall thickness of a representative sample of elbows to determine the average corrosion rate. Plaintiffs did not introduce evidence of, or compare, ExxonMobil's inspection protocol with that of other coker unit operators or the industry generally, nor did it prove that such an approach would have found the defective elbow.

20.     Plaintiffs also did not establish the applicable standard of care here. Plaintiffs' experts did not define a prudent inspection program, including one which described the appropriate time interval between inspections and the appropriate number of inspection points, given the particular materials processed in the East Coker Unit. The trial evidence was limited to general principles of pipe inspection, including the relationship between piping material and the rate of corrosion, and the proper placement of measuring equipment. When Defendant asked Dr. Busch to describe an appropriate inspection program for the East Coker Unit, he responded, "I think the experience of the petrochemical people would determine that." (Trial Tr. at 99) Plaintiffs did not articulate a specific, substantive standard of care against which to measure ExxonMobil's conduct and, therefore, Plaintiffs did not prove that Defendant was negligent.

21.     Any Conclusion of Law that is more properly a Finding of Fact should be so construed.

22.     Based on the Findings of Fact and Conclusions of Law, the Court determines that

Defendant is not liable to Plaintiffs for their alleged injuries under either a strict liability or negligence theory. Defendant is thus entitled to judgment in its favor. The Court will enter a judgment by separate document in favor of Defendant.

    **SO ORDERED**.

    July 18, 2008.

                                      **BARBARA M. G. LYNN**
                                      **UNITED STATES DISTRICT JUDGE**
                                      **NORTHERN DISTRICT OF TEXAS**